IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 16-cv-02486-MSK-KLM

SGS ACQUISITION COMPANY LIMITED,

    Plaintiff,

v.

DAVID LINSLEY;
BERNARD GUARNERA;
NORTHERN ZINC, LLC;
STAR MOUNTAIN RESOURCES, INC.; and
BROADLANDS MINERAL ADVISORY SERVICES, LTD,

    Defendants.

_____

**OPINION AND ORDER DENYING MOTION TO DISMISS**
_____

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion to Dismiss Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) **(#61)**, the Plaintiffs' response **(#62)**, and the Defendants' reply **(#63)**.

## JURISDICTION

The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## ALLEGED FACTS

The Court offers a brief summary of the Second Amended Complaint's allegations here and elaborates as necessary in its analysis.

Plaintiff SGS Acquisition Company Limited ("SGS") intended to purchase a zinc mine and retained Defendants David Linsley and Bernard Guarnera to assist in obtaining financing and performing due diligence for the purchase. Mr. Linsley and Mr. Guarnera are partners at

1

non-party Centurion Resource Group ("Centurion"). It was contemplated that SGS would purchase the mine with private equity from Centurion, and Mr. Linsley and Mr. Guarnera assured[1] SGS that Centurion would finance the purchase of the mine.

Relying on Mr. Linsley and Mr. Guarnera's assurance, on February 20, 2014, SGS prepared a Letter of Intent ("LOI") to purchase the mine and presented it to the mine's owner. Shortly thereafter, the mine's owner agreed to the terms of the LOI, and SGS and the mine's owner had 75 days to perform due diligence and finalize the transaction.

During the due diligence period, SGS, Mr. Linsley, and Mr. Guarnera visited the mine. At the mine, Mr. Linsley and Mr. Guarnera learned SGS's plan for the mine and received certain "confidential information" from the mine's management. SGS also gave them access to SGS's confidential financial information, tax information, financial models, prospective business opportunities, mining concept, deal or acquisition plan and structure, and the LOI.

After the mine visit, Centurion changed the terms under which it had proposed to finance the mine's purchase, requiring SGS to make larger payments to repay Centurion and to adhere to a different payment schedule than what was anticipated under the LOI. Mr. Linsley and Mr. Guarnera also stopped providing any assistance to finalize SGS's purchase of the mine and would not return SGS's phone calls or emails. SGS decided to seek financing from another source, but was unable to do so. The due diligence period ended without financing in place, the LOI expired, and SGS was unable to purchase the mine.

Subsequently, Defendant Northern Zinc, LLC ("Northern Zinc") – a company in which Mr. Linsley and Mr. Guarnera were partners – purchased the company that owned the mine. Thereafter, Defendant Star Mountain Resources, Inc. ("Star Mountain") purchased Northern

---

[1] It is unclear from the Second Amended Complaint exactly what assurances Mr. Linsley and Mr. Guarnera gave SGS.

2

Zinc. As part of this purchase, Mr. Linsley and Mr. Guarnera received 10,000,000 shares of Star Mountain's stock in exchange for their interests in Northern Zinc, and Star Mountain assumed $1.39 million in Northern Zinc's debts.

In its Second Amended Complaint **(# 58)**, SGS asserts six claims, all arising under Colorado law[2]: (i) Intentional Interference with Prospective Business Relations against Mr. Linsley and Mr. Guarnera; (ii) Intentional Interference with Contract against Mr. Linsley and Mr. Guarnera; (iii) Breach of Fiduciary Duty against Mr. Linsley and Mr. Guarnera; (iv) Misappropriation of Trade Secrets, ostensibly against all Defendants; (v) Misappropriation of Business Value against Mr. Linsley and Mr. Guarnera; and (vi) Vicarious Liability[3] against Broadlands Mineral Advisory Services, Ltd. ("Broadlands")

The Defendants filed a joint Motion to Dismiss **(#61)** in which they argue that the Second Amended Complaint does not allege sufficient facts to state any of the claims against them under Federal Rule of Civil Procedure 12(b)(6).

## ANALYSIS

### A. Standard of review

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all well-pleaded allegations in the Complaint as true and views those allegations in the light most favorable to the nonmoving party. *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1149 (10th Cir. 2001) (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)). The Court limits its consideration to the four corners of the

---

[2]The parties agree that Colorado law governs this action.

[3]This is not an independent claim and should not have been pled as such. Rather, it is an attempt to impute liability to Broadlands based on Mr. Guarnera's actions under the theory of *respondeat superior*.

Complaint, any documents attached thereto, and any external documents that are referenced in the Complaint and whose accuracy is not in dispute. *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

A claim is subject to dismissal unless it is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To make such an assessment, the Court first discards those averments in the Complaint that are merely legal conclusions or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678-79. The Court takes the remaining, well-pleaded factual contentions, treats them as true, and ascertains whether those facts (coupled, of course, with the law establishing the requisite elements of the claim) support a claim that is "plausible" as compared to merely being "conceivable" or "possible". What is required to reach the level of "plausibility" varies from context to context, but generally, allegations that are "so general that they encompass a wide swath of conduct, much of it innocent," are not sufficient. *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

**B. Intentional Interference with Prospective Business Relations**

To prove a claim of intentional interference with prospective business relations, SGS must establish that Mr. Linsley and Mr. Guarnera: (i) interfered with (ii) SGS's prospective business relation, (iii) which prevented SGS from entering into, acquiring, or continuing the prospective relation, and (iv) that Mr. Linsley and Mr. Guarnera did so intentionally and improperly. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 502 (Colo. 1995). Mr. Linsley and Mr. Guarnera argue that the Second Amended Complaint's allegations are not sufficient to show that they interfered with SGS's prospective business relations with the mine's owner, and that any such interference was not improper. They further argue than any alleged improper influence did not prevent SGS from purchasing the mine. SGS argues that the allegations show Mr. Linsley

4

and Mr. Guarnera improperly interfered by wrongfully withholding financing, thus preventing SGS from purchasing the mine.

   1. **Whether the Second Amended Complaint sufficiently alleges interference**

Courts have not examined, in detail, the types of actions that might constitute "interference" with a prospective business relationship. In Section 766[4] of the Restatement of Torts – which Colorado follows in fashioning the tort – the authors recognize several acts that could constitute interference. Most take the form of a defendant (A) inducing a third party (B) to refuse to do business with the plaintiff (C). The authors specifically describe, as one potential form of interference, "inducement by offer of better terms," a situation in which A becomes aware of B's business relations with C, and A interferes with that relationship by offering B more favorable terms than C, with the specific intention that B cease its dealings with C and instead transact with A. *Id.*, *comment m.* The authors of the Restatement acknowledge that A always retains a "freedom to contract his business in the usual manner" and compete normally with C for B's patronage; thus, the question of whether A's actions constitute interference is often "a nice question of fact." *Id.*

On the facts of the Second Amended Complaint, taken in the light most favorable to SGS, the Court finds that SGS has adequately alleged that Mr. Linsley and Mr. Guarnera interfered with SGS's intended purchase of the mine in the manner described in the Restatement. Mr. Linsley and Mr. Guarnera became aware of SGS's intended business relationship with the mine's owner, including terms that SGS was prepared to offer. The Complaint suggests that Mr. Linsley and Mr. Guarnera concluded that they could offer better terms to the mine's owner, and

---

[4] Section 766 deals with the tort of tortious interference with contract. The tort of interference with prospective business relations is a subset of the contractual interference tort and is subject to most of the same principles. Restatement, § 766B, *comment a*.

thus acquire the mine for themselves. They did not carry out this plan through ordinary, fair competition on the open market – *e.g.* by announcing themselves as a competitor to SGS for the mine and offering a bid to the mine's owner based solely on an educated guess as to the contents of SGS' bid. Rather, they associated themselves with SGS through the premise of funding the transaction via Centurion, obtained inside knowledge about the terms of the proposed sale and SGS' bid, and eventually acted to frustrate SGS' ability to complete the sale on those terms by refusing to extend financing on terms upon which they had previously agreed with SGS.[5] Viewed most favorably to SGS, this conduct could fall within the type of improper interference described in the Restatement. Admittedly, it is a close question and one whose outcome could change dramatically depending on what the facts ultimately show. But at this early stage in the litigation, the Court finds that the facts recited in the Second Amended Complaint could adequately demonstrate improper "interference."

**2. Whether Mr. Linsley and Mr. Guarnera's alleged interference was improper**

The next inquiry is whether Mr. Linsley and Mr. Guarnera's alleged interference was "improper." The analysis of whether interference is "improper" requires the Court to balance seven factors: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual

---

[5] It is important to remember that the tort requires three characters, A, B, and C, to function properly. In other words, it is not enough to say that SGS contracted with Mr. Linsley and Mr. Guarnera/Centurion for financing assistance, and that those defendants "interfered" with the SGS-Centurion contract. It is impossible for a party to a contract to tortiously interfere with that contract itself. *MDM Group Assocs. v. CX Reinsurance Co.*, 165 P.3d 882, 886 (Colo.App. 2007).

Thus, for SGS to maintain a tortious interference claim against Mr. Linsley and Mr. Guarnera, it must be incident to an actual or prospective contract that SGS had with a <u>third</u> party – here, the mine's owner.

interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties. *See Westfield Dev. Co. v. Rifle Inv. Assocs.*, 786 P.2d 1112, 1118 (Colo. 1990); Restatement (Second) Torts § 767. None of these factors is dispositive, and the weight to be given to each factor may vary depending on the circumstances of each case. *Amoco Oil Co.*, 908 P.2d at 501.

The first through sixth factors all weigh in favor of finding that Mr. Linsley and Mr. Guarnera improperly interfered with SGS's prospective business relations. Regarding the first factor, improper interference is often shown by a defendant engaging in fraud or misrepresentation, physical violence, threats of illegal conduct, threatening civil litigation, threatening criminal prosecution, exerting improper economic pressure, violating recognized ethical codes or business practices, or other forms of misconduct. *See Amco Oil Co. v. Ervin*, 908 P.2d 493, 501-02 (Colo. 1995); Restatement (Second) Torts § 767, *comment c*. Among the factors that demonstrate improper "misconduct" are deviations by a defendant from "recognized ethical codes for a particular area of business activity or of established customs or practices regarding disapproved actions or methods." *Id.* Once again, taking the facts in the light most favorable to SGS, one can infer that SGS hired Mr. Linsley and Mr. Guarnera to assist it with completing the purchase of the mine, and that the Defendants decided to frustrate those intentions and usurp the opportunity to obtain the mine for their own benefit. These facts could support an inference that the Defendants' actions constituted misconduct.

The second factor requires allegations showing that Mr. Linsley and Mr. Guarnera acted, at least in part, with the intent to interfere with SGS's contractual or prospective economic relations with the mine's owner or with the intent to harm or vent their ill will against SGS. *See* Restatement (Second) Torts § 767*, comment d*. One can reasonably infer that Mr. Linsley and

7

Mr. Guarnera were motivated by the desire to prevent SGS from purchasing the mine so that they or other entities with which they were associated could purchase it. Thus, the allegations sufficiently show their intent to interfere.

The third factor considers SGS's interest in the mine. SGS had not yet concluded a contract of sale for the mine when it retained Mr. Linsley and Mr. Guarnera, but it had entered into a LOI with the mine's owner based on the Defendants' assurance that Centurion would fund the purchase. This conferred on SGS a limited, expectancy interest in the mine that would have matured into ownership had SGS been able to obtain financing to purchase it.

As to the fourth factor, Mr. Linsley and Mr. Guarnera acted with the intent to prevent SGS from purchasing the mine so that they could purchase it. Seeking to gratify one's ill will or to harm another is improper. *See* Restatement (Second) Torts § 767, *comment f*. By allegedly acting to prevent SGS from purchasing the mine, Mr. Linsley and Mr. Guarnera improperly sought to harm SGS's economic interests.

Concerning the fifth factor, society has an interest in ensuring that Mr. Linsley and Mr. Guarnera performed their obligations to SGS, if any, in good faith. *See Amoco Oil Co.*, 908 P.2d at 498. The Second Amended Complaint's allegations are somewhat vague as to what Mr. Linsley and Mr. Guarnera's obligations to SGS were. However, it does allege that Mr. Linsley and Mr. Guarnera assured SGS that Centurion would provide financing. SGS relied on that assurance. Knowing of SGS's reliance, Mr. Linsley and Mr. Guarnera acted to prevent SGS from purchasing the mine, which is not good-faith conduct.

The sixth factor focuses on whether an actor's conduct directly or indirectly results in interference with contractual or prospective economic relations. *See* Restatement (Second) Torts § 767, *comment h*. Mr. Linsley and Mr. Guarnera's decision to change the terms under which

Centurion would finance SGS's purchase of the mine, refusal to communicate with SGS, and ultimate purchase of the mine prevented SGS from purchasing it. Thus, their conduct directly interfered with SGS's economic relations with the mine's owner.

Finally, as to the seventh factor, the Second Amended Complaint alleges that SGS retained Mr. Linsley and Mr. Guarnera to assist in purchasing the mine by obtaining financing from Centurion and performing due diligence. However, there are no other allegations describing their relationship, and it would appear, with one exception discussed below, that they had an arms-length relationship. Without more, the Court cannot say that this factor weighs in favor of finding that Mr. Linsley and Mr. Guarnera improperly interfered with SGS's prospective business relations.

In summary, at least six of seven factors weigh in favor of finding that Mr. Linsley and Mr. Guarnera improperly interfered with SGS's prospective business relations. Thus, the Court finds that the Second Amended Complaint sufficiently alleges improper interference by Mr. Linsley and Mr. Guarnera.

3. **Whether Mr. Linsley and Mr. Guarnera's alleged improper interference prevented SGS from purchasing the mine**

To establish that Mr. Linsley and Mr. Guarnera's alleged improper interference prevented SGS from purchasing the mine, the Second Amended Complaint must show "a reasonable likelihood or reasonable probability" that the sale would have been consummated. *See MDM Group Assocs., Inc. v. CX Reinsurance Co. Ltd.*, 165 P.3d 882, 886 (Colo. Ct. App. 2007). SGS had entered into the LOI to purchase the mine, and the Court can infer from the Second Amended Complaint that SGS was willing the meet the mine owner's terms, but for Centurion's modification of the proposed financing terms to SGS. This is sufficient to show that there was a reasonable probability that SGS would have purchased the mine, but for Mr. Linsley and Mr.

9

Guarnera's last-minute modification of the proposed financing terms. The facts suggest the possibility that the modification was made to prevent SGS from purchasing the mine, thereby leaving it available for the Defendants. Thus, there is a reasonable inference to be drawn that, had Mr. Linsley and Mr. Guarnera not acted to prevent SGS from purchasing the mine, there was a reasonable probability that the sale would have been consummated. Accordingly, the Court finds that SGS has adequately pled a claim for tortious interference with prospective business advantage against Mr. Linsley and Mr. Guarnera.

**C. Intentional Interference with Contract**

To prove a claim of intentional interference with contract, SGS must establish that Mr. Linsley and Mr. Garnera: (i) were aware of a contract between SGS and the mine's owner, (ii) improperly interfered with the contract with the intent that one of the parties breach the contract, and (iii) induced the mine's owner to breach the contract or made it impossible for SGS to perform the contract. *See Krystkowiak v. W.O. Brisben Cos.*, 90 P.3d 859, 871 (Colo. 2004). Mr. Linsley and Mr. Guarnera argue that the Second Amended Complaint fails to allege that they interfered with SGS's contractual relations, but if it does, such alleged interference was not improper.

The analysis of whether interference is "improper" is identical for intentional interference with contract and intentional interference with prospective business relations claims. *See Westfield Dev. Co. v. Rifle Inv. Assocs.*, 786 P.2d 1112, 1118 (Colo. 1990); Restatement (Second) Torts § 767. As discussed above, the Second Amended Complaint sufficiently alleges that Mr. Linsley and Mr. Guarnera improperly interfered with SGS's purchase of the mine. Thus, the Court will not dismiss SGS's claim for intentional interference with contract.

**D. Breach of Fiduciary Duty**

To prove a claim of Breach of Fiduciary Duty, SGS must establish that: (i) Mr. Linsley and Mr. Guarnera were acting as fiduciaries to SGS; (ii) they breached a fiduciary duty to SGS; (iii) SGS incurred damages; and (iv) Mr. Linsley and Mr. Guarnera's breach of fiduciary duty was a cause of SGS's damages. *See Sewell v. Great N. Ins. Co.*, 535 F.3d 1166, 1172 (10th Cir. 2008)(citing *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1022 (Colo. Ct. App. 1993)). Mr. Linsley and Mr. Guarnera argue that the Second Amended Complaint's allegations do not show that they had a fiduciary relationship with SGS or that they breached any fiduciary duty. SGS argues that the allegations that it retained the services of Mr. Linsley and Mr. Guarnera to perform due diligence and obtain financing are sufficient to show a fiduciary relationship. It also argues that the allegations show that Mr. Linsley and Mr. Guarnera breached their fiduciary duty "by disseminating SGS's trade secrets, confidential information, proprietary information and business prospects, and using that information for their own benefit to the determinant of SGS."

A fiduciary relationship arises under Colorado law in situations in which one party "is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Moses v. Diocese of Colo.*, 863 P.2d 310, 321 (Colo. 1993). A fiduciary relationship may arise (1) as a matter of law (*e.g.* the attorney-client and trustee-trust beneficiary relationships) or (2) when one party is in a superior position to another and assumes a duty to act in the other's best interest, has "extensive influence and control over the other's interests", or has received "special trust and confidence" from and occupies a position to exercise influence over the other. *Accident & Injury Med. Specialists, P.C. v. Mintz*, 279 P.3d 658, 663 (Colo. 2012) (internal citations omitted).

As discussed above, the Second Amended Complaint shows that Mr. Linsley and Mr. Guarnera acted as Centurion's representatives when they interacted with SGS. SGS has not

provided, and the Court cannot find, any statutory or case law that a fiduciary relationship arises as a matter of law between prospective creditors and prospective borrowers. However, there are allegations showing that SGS reposed special trust and confidence in Mr. Linsley and Mr. Guarnera, and that Mr. Linsley and Mr. Guarnera knowingly accepted that trust and confidence. During the course of their relationship, Mr. Linsley and Mr. Guarnera received SGS's financial information, tax information, financial models, prospective business opportunities, mining concept, deal or acquisition plan and structure, and the LOI as it related to the mine. SGS could reasonably expect Mr. Linsley and Mr. Guarnera to keep this information confidential and to use it only for the purposes for which it was provided. If they were to disclose it to third parties or use it for other purposes, it could cause substantial harm to SGS. This would place them in a position to exercise influence over SGS. Thus, taken in the light most favorable to SGS, the allegations in the Second Amended Complaint sufficiently allege a fiduciary relationship between SGS and Mr. Linsley and Mr. Guarnera as to the use and dissemination of SGS's confidential information.

Mr. Linsley and Mr. Guarnera's fiduciary relationship with SGS gave rise to two duties: first, to keep SGS's confidential information confidential, and second, not to use the information for any unauthorized purposes. The Second Amended Complaint alleges that instead of doing so, Mr. Linsley and Mr. Guarnera disclosed SGS's confidential information to third parties and used it to purchase the mine. This would be sufficient to show that they breached their fiduciary duties to SGS. Thus, the Court will not dismiss SGS's claim for breach of fiduciary duty.

**E. Misappropriation of Trade Secrets under Colo. Rev. Stats. § 7-74-101,** *et seq***.**

To prove a claim of Misappropriation of Trade Secrets, SGS must establish (1) that SGS possessed a valid trade secret, (2) that the trade secret was disclosed or used by the Defendants

without consent, and (3) that the Defendants knew, or should have known, that the trade secret was acquired by improper means. *See Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993). The Defendants argue that the Second Amended Complaint's allegations are insufficient to show that SGS possessed any trade secrets or, if it did, those trade secrets were not misappropriated by improper means.

Under Colorado law, a trade secret is "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." Colo. Rev. Stat. § 7-74-102(4). Further, the holder of an alleged trade secret must have acted reasonably to prevent its disclosure. *See Saturn Sys. Inc. v. Militare*, 252 P.3d 516, 522 (Colo. App. 2011).

The Second Amended Complaint alleges that SGS's financial information, tax information, financial models, prospective business opportunities, mining concept, deal or acquisition plan and structure, and the LOI all constitute trade secrets. SGS's private financial information, which would include tax information and financial models, falls squarely with the statutory definition of "trade secret". Prospective business opportunities might be said to be analogous to listings of names, addresses, or telephone numbers, which could enjoy trade secret protection. And SGS's mining concept conceivably could constitute a process or procedure that was not known to others and that SGSintended to employ after purchasing the mine.[6] Further, according to the Second Amended Complaint, SGS stored this information in an online, password-protected "data room". Limiting access to this information in this manner constitutes

---

[6] The Court expresses no opinion as to whether any of the other categories of information SGS identifies constitute trade secrets.

reasonable efforts to keep it secret. Therefore, there are sufficient allegations to show that SGS possessed valid trade secrets.

The Court now considers whether the Second Amended Complaint shows that SGS's trade secrets were misappropriated by improper means. The statutory definition of improper means includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Colo. Rev. Stat. § 7-74-102(1). There are no allegations that any Defendant or third party committed theft, bribery, misrepresentation, or espionage to obtain SGS's trade secrets. However, there are sufficient allegations to show that Mr. Linsley and Mr. Guarnera owed SGS a duty to keep SGS's information confidential and use it only as SGS intended. The Second Amended Complaint alleges that rather than maintaining its secrecy, Mr. Linsley and Mr. Guarnera used the information and disclosed it to other entities, including Northern Zinc and Star Mountain, during the purchase and subsequent resale of the mine. This would constitute a breach of their duty to maintain secrecy and, therefore, falls within the statutory definition of "improper means." Thus, the Second Amended Complaint's allegations are sufficient to show that SGS's trade secrets were misappropriated by improper means.

**F. Misappropriation of Business Value against Mr. Linsley and Mr. Guarnera**

To prove a claim of Misappropriation of Business Value, SGS must establish that Mr. Linsley and Mr. Guarnera appropriated a product of SGS's expenditure of labor, skill, and money. *Smith v. TCI Commc'ns*, 981 P.2d 690, 694 (Colo. Ct. App. 1999). Mr. Linsley and Mr. Guarnera argue that the Second Amended Complaint does not allege that SGS produced any product by its expenditure of labor, skill, and money, or that they or the seller of the mine used

any such product, or that any such product was not otherwise available to them. However, they fail to cite any case law in support of their arguments.

The contours of Colorado's cause of action for misappropriation of business value are not well-defined. Nevertheless, *Smith v. TCI Commc'ns*, 981 P.2d 690 (Colo. Ct. App. 1999) provides some guidance. In *Smith*, the Plaintiffs intended to develop a cable television channel to broadcast television and movies made by or starring African-Americans and educational and community programming focusing on the needs of the African-American community. They expended time, money, energy, and other resources in developing detailed business plans and strategies to implement them. After the plaintiffs presented their idea to a cable television provider, the provider announced that it would develop a television channel devoted to showing movies starring African-Americans. The plaintiffs brought a claim for misappropriation of business value, alleging that the provider misappropriated their idea for the new channel and their specific business plans to implement their idea. The Colorado Court of Appeals held that these allegations were sufficient to state a claim against the provider. *Id*. at 695.

In the present case, the Second Amended Complaint alleges that SGS expended time, money, energy, and other resources to structure a deal to purchase the mine. Additionally, upon inspection of the mine, SGS recognized problems with the manner in which the mine's resources were being extracted. SGS expended time, money, energy, and other resources to develop a mining concept that would correct those problems. Like the plaintiffs in *Smith*, SGS had developed a business plan and a strategy to implement it. According to the Second Amended Complaint, Mr. Linsley and Mr. Guarnera stole both the transactional structure that SGS had devised to purchase the mine and SGS's mining concept and ultimately benefited from that theft

15

when they purchased the mine and later sold it to Star Mountain. This is sufficient to state a claim.

**G. Vicarious Liability**

Finally, Broadlands argues that the Second Amended Complaint does not state a basis to hold it vicariously liable for Mr. Guarera's conduct. Under the doctrine of *respondeat superior*, an employer is liable for its employee's tortious conduct if the conduct occurred within the course and scope of employment. *Grease Monkey Int'l, Inc. v. Montoya*, 904 P.2d 468, 473 (Colo. 1995). Broadlands does not argue that the Second Amended Complaint fails to allege that Mr. Guarnera was not its employee or that he was not acting within the course and scope of his employment. Rather, it argues that the Second Amended Complaint fails to show that Mr. Guarnera engaged in any tortious conduct. As discussed above, it does sufficiently allege that Mr. Guarnera engaged in tortious conduct, and none of the claims against the other defendants will be dismissed at this juncture of the case. Therefore, the claims against Broadlands will not be dismissed either.

## **CONCLUSION**

For the foregoing reasons, the Defendants' Motion to Dismiss Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) **(#61)** is **DENIED**.

Dated this 23d day of March, 2018.

**BY THE COURT:**

*Marcia S. Krieger*

Marcia S. Krieger
Chief United States District Judge