**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 16-cv-02486-MSK-KLM

**SGS ACQUISITION COMPANY LIMITED,**

    **Plaintiff,**

**v.**

**DAVID LINSLEY;
BERNARD GUARNERA;
NORTHERN ZINC, LLC;
STAR MOUNTAIN RESOURCES, INC.; and
BROADLANDS MINERAL ADVISORY SERVICES, LTD,,**

    **Defendants.**

---

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY
JUDGMENT**

---

    **THIS MATTER** comes before the Court pursuant to a Motion for Summary Judgment

filed by Defendants Linsley, Guarnera, Broadlands and Northern Zinc, LLC. Star Mountain

Resources, Inc. ("Star Mountain") (**#82**).[1]  In addition to that Motion for Summary Judgment, the

Court has reviewed the briefing and exhibits submitted by the parties (**#86** and **#87**).

---

[1]  Although Star Mountain filed a Motion for Summary Judgment (**#83**).  Subsequently, Star
Mountain filed a Chapter 11 Bankruptcy petition in Case No. 2:18-bk-01594-DPC in the
Bankruptcy Court for the District of Arizona.  As a result, claims against it and its wholly owned
subsidiary, Northern Zinc, are subject to the automatic stay put in place pursuant to 11 U.S.C. §
362.  SGS filed a motion for relief from that automatic stay to pursue claims against Star Mountain
and Northern Zinc. but the motion was denied by the Bankruptcy Court on June 26, 2018.  Star
Mountain's motion for summary judgment was denied with leave to refile if and when the
automatic stay is lifted on August 14, 2018 (**#111**).  As reflected at the end of this Order, the Court
similarly denies the Motion for Summary Judgment as to Northern Zinc with leave to refile or
resolve it in the bankruptcy claims process.

## I.    Jurisdictional Statement

The Court exercises jurisdiction in this matter pursuant to 28 U.S.C. § 1332.  Colorado law applies to the claims asserted in this diversity case.

## II.    Summary of Relevant Material Facts

The Court begins with a brief summary of the relevant material facts and elaborates as necessary in its analysis.  Undisputed facts[2] are treated as true, and disputed facts are construed most favorably to the non-movant, SGS Acquisition Company ("SGS").

During late 2013 and early 2014, SGS became interested in purchasing a closed zinc mine known as the Balmat mine located in upstate New York.  To acquire the mine, on February 20, 2014, SGS entered into a Letter of Intent (the "LOI") with Hudbay Minerals Inc. ("Hudbay") to acquire all issued and outstanding shares and intercorporate debt of Balmat Holding Corporation and St. Lawrence Zinc Company (for convenience, the Court will use the term "Hudbay" to also refer to the object of the contemplated purchase).  The SGS LOI provided that the sale price was $13 million, with $3 million to be paid on closing (to be financed through an initial public offering), $5.5 million when SGS decided to put the mine in production, and $4.5 million in periodic installments out of net cash flow from the mine's operations.  The LOI gave SGS an exclusive 75-day window to conduct its due diligence and determine whether it wanted to proceed with the deal.

SGS told David Linsley, Bernard Guarnera, and the firm with which they were associated, Centurion Private Equity Partners ("Centurion"), about the mine being offered for sale.

---

[2] Undisputed facts are those stipulated to and those supported by evidence, but where the parties' characterization of a fact as undisputed does not correspond to the evidence submitted, the Court defers to the evidence itself.

Apparently, SGS did not intend to operate the mine, but instead wished to sell its acquisition or ownership rights to some third party – in essence, flipping the interest in the mine for a premium sale price. It approached Centurion for assistance in finding an interested third party buyer. Centurion agreed to solicit a buyer in exchange for payment of a procurement commission. For that purpose, SGS and Centurion also entered into a "Non-Compete and Non Disclosure Agreement" (the "NDA") which was intended to cover information about the mine learned by Centurion as a result of the arrangement.

During March and April 2014, Mr. Linsley dealt with SGS on behalf of Centurion, which focused its efforts on an entity referred to as the "Korean client." There were many communications between Mr. Linsley on behalf of Centurion, and Jeremy Read on behalf of SGS, but by April 24, no deal had been struck between the Korean client and SGS and SGS informed Mr. Linsley that it no longer interested in dealing with Centurion or the Korean client. The 75-day exclusivity window in the LOI expired on May 2, 2014, without a sale to SGS or extension of the LOI.

On July 7, 2014, Northern Zinc, LLC ("Northern Zinc") (an entity in which Mr. Linsley and Mr. Guarnera had some ownership interest) made an offer to purchase the Hudbay interests. Hudbay accepted the offer on July 8, 2014, and the sale closed in November 2015, with the shares being transferred to Star Mountain Resources Inc.

Contending that Mr. Guarnera, Mr. Linsley, and Centurion improperly deprived SGS of its opportunity to acquire the Balmat mine, SGS filed the instant lawsuit on October 4, 2016. SGS's Second Amended Complaint (**#58**) asserted five claims, all arising under Colorado state law: (i) Intentional Interference with Prospective Business Relations against Mr. Linsley and Mr. Guarnera; (ii) Intentional Interference with Contract against Mr. Linsley and Mr. Guarnera; (iii)

Breach of Fiduciary Duty against Mr. Linsley and Mr. Guarnera; (iv) Misappropriation of Trade Secrets, ostensibly against all Defendants; and (v) Misappropriation of Business Value against Mr. Linsley and Mr. Guarnera. SGS also asserted a vicarious liability "claim" against Defendant Broadlands Mineral Advisory Services ("Broadlands") for indemnification for acts by Mr. Guarnera.[3] Mr. Linsley, Mr. Guarnera and Broadlands seek summary judgment on all claims against them (**#82**). The parties agree that Colorado law governs the determination of all of those claims.

### III.    Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Thus, the primary question presented to the Court in considering a Motion for Summary Judgment or a Motion for Partial Summary Judgment is: is a trial required?

A trial is required if there are material factual disputes to resolve. As a result, entry of summary judgment is authorized only "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). A fact is material if, under the substantive law, it is an essential element of the claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the conflicting evidence would enable a rational trier of fact to resolve the dispute for either party. *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

---

[3]  As noted in the Court's Order on the prior Motion to Dismiss (**#97**), this claim seeks to impute liability to Broadlands solely based on Mr. Guarnera's actions under the doctrine of *respondeat superior*. The Court therefore views this "claim" as effectively naming Broadlands as a Defendant with respect to the remaining five claims currently being asserted against Mr. Guarnera. Claims against Broadlands will only be permitted to proceed insofar as any claims against Mr. Guarnera survive summary judgment.

The consideration of a summary judgment motion requires the Court to focus on the asserted claims and defenses, their legal elements, and which party has the burden of proof. Substantive law specifies the elements that must be proven for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson*, 477 U.S. at 248; *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). As to the evidence offered during summary judgment, the Court views it the light most favorable to the non-moving party, thereby favoring the right to trial. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

Motions for summary judgment generally arise in one of two contexts – when the movant has the burden of proof and when the non-movant has the burden of proof. Each context is handled differently. When the movant has the burden of proof, the movant must come forward with sufficient, competent evidence to establish each element of its claim or defense. *See* Fed. R. Civ. P. 56(c)(1)(A). Presumably, in the absence of contrary evidence, this showing would entitle the movant to judgment as a matter of law. However, if the responding party presents contrary evidence to establish a genuine dispute as to any material fact, a trial is required and the motion must be denied. *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

A different circumstance arises when the movant does not have the burden of proof. In this circumstance, the movant contends that the non-movant lacks sufficient evidence to establish a *prima facie* case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party must identify why the respondent cannot make a *prima facie* showing; that is, why the evidence in the record shows that the respondent cannot establish a particular element. *See Collins*, 809 F.3d at 1137. If the respondent comes forward with sufficient competent evidence to establish a *prima*

*facie* claim or defense, then a trial is required. Conversely, if the respondent's evidence is inadequate to establish a *prima facie* claim or defense, then no factual determination of that claim or defense is required and summary judgment may enter. *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

## IV.    Discussion

### A.    Intentional Interference with Contract (Count II)

The Court begins its analysis with SGS's claim against Mr. Linsley and Mr. Guarnera for intentional interference with contract. The contract in question is the SGS LOI[4] with Hudbay.

The elements of the tort of intentional interference with contractual obligations under Colorado law are: (1) the defendant was aware of a contract between two parties, (2) the defendant intended that one of the parties breach the contract, and (3) the defendant induced the party to breach or make it impossible for the party to perform the contract.[5] *Krystkowiak v. W.O. Brisben Cos., Inc.*, 90 P.3d 859, 871 (Colo. 2004); *Lutfi v. Brighton Cmty. Hosp. Ass'n*, 40 P.3d 51, 58 (Colo. App. 2001). Mr. Linsley and Mr. Guarnera essentially contend that summary judgment is appropriate on SGS's tortious interference with contract claim because SGS has not come forward with evidence to establish that they made it impossible for SGS to perform under the LOI.

---

[4] The LOI might be more properly described as a unilateral or option contract, by which SGS had the <u>option</u> to perform (by buying the BHC shares) or not. Nevertheless, the Court will treat it as an ordinary bilateral contract for purposes of this analysis.

[5] The Court notes that the parties disagree as to the formulation of the elements of a tortious interference with contract claim; in addition to the foregoing three-element test that was argued by SGS (citing *Krystkowiak*), Mr. Linsley and Mr. Guarnera offer a four- or five-element test (depending on whether one considers incurring damages to be an element), citing a decision of the Colorado Court of Appeals. *Citing Harris Group v. Robinson*, 209 P.3d 1188, 1195 (Colo.App. 2009). Although the Court believes that SGS's three-element formulation is the more appropriate one, *see Hertz v. Luzenac Group*, 576 F.3d 1103, 1118-19 (10th Cir. 2009); *Ecco Plains, LLC v. U.S.*, 728 F.3d 1190, 1198-99 (10th Cir. 2013), the differences between the parties' iteration of the applicable elements would not materially alter the analysis herein.

Greatly summarized, the LOI called for SGS to make an initial payment of $3 million to complete the first step of the Hudbay acquisition. The sale was not consummated, and the question presented is whether SGS has produced competent evidence that would suggest that Mr. Linsley and Mr. Guarnera engaged in actions that prevented SGS from making that payment and consummating the sale.  SGS contends that Mr. Linsley and Mr. Guarnera interfered with the LOI by representing to it that Centurion "was obtaining financing (and in fact the Koreans would do the deal)" and that SGS relied on those representations such that, after negotiations with Centurion fell through, they were unable to "find[ ] other financing" before the LOI expired.

**Claim against Mr. Guarnera:**

No evidence in the record shows any act by Mr. Gaurnera that can reasonably be construed as making any representation to SGS about obtaining financing during the SGS LOI period. According to Mr. Linsley's declaration – which SGS has not disputed – Mr. Guarnera was simply a consultant to Centurion.  There is no evidence that Mr. Guarnera made representations to SGS concerning obtaining financing; rather, all such communication with Centurion was with <u>Mr. Linsley,</u> and at most, Mr. Guarnera was copied as a recipient on such communications.  Thus, there is no showing that Mr. Guarnera ever represented to SGS that Centurion was obtaining funding with the purpose of hindering SGS's ability to perform under its SGS LOI.  Accordingly, Mr. Guarnera is entitled to summary judgment on SGS's claim against him for Intentional Interference With Contract.

**Claim against Mr. Linsley**

As noted, above, Mr. Linsley conducted the communications with SGS on behalf of Centurion.  In early March 2014, after the SGS LOI was executed, SGS, through Mr. Read, wrote to Mr. Linsley expressing SGS's interest in "selling out to the Koreans and walking away if it were

made worthwhile for us." He also advised that SGS was talking to another entity – Glencore – and that SGS's Canadian brokers were also "keen to introduce capital," indicating that SGS was pursuing several different sets of possible investors in addition to Centurion's Korean client. In late March, Mr. Linsley advised that the Korean client was "happy to do a deal" with SGS and requested that SGS provide a copy of the LOI, but, as discussed below, it appears that Mr. Read initially either ignored or denied that request. Following a conversation on March 27, 2014 between Mr. Read and Mr. Linsley, Mr. Read e-mailed Mr. Linsley stating that SGS needed a firm decision in the "short term" as to the structure of the deal. He acknowledged that SGS could ask for an extension of the LOI deadline with Hudbay, but that it would need justification. Mr. Read then spelled out terms of the deal that would be acceptable to SGS.

Mr. Linsley responded on April 8, 2014 by again requesting a copy of the SGS LOI, and he explained that the Koreans are "keen to do this deal" but indicated that they could not understand why they were unable to see the LOI and related documents. Between April 8 and 16, 2014, Mr. Linsley made a proposal on behalf of the Korean client, but it was rejected by SGS. By April 16, 2014, Mr. Read appeared to begin taking steps to distance from Centurion, telling Mr. Linsley that "[g]iven the huge differences between what we put on the table and apparent position of your investors, we don't think it fruitful to come back with another structure." Although he indicated that SGS would remain open to another offer, he stated "[we] must assume that you won't be able to come up which an acceptable plan and make appropriate arrangements, which are agreeable to us in any case."

On April 23, 2014, Mr. Read again wrote to Mr. Linsley, stating that other SGS officials had become persuaded that there were other "credible investors who are serious about investing on acceptable terms," and suggesting that, if Centurion wanted to do the deal, "you have to give

me something in writing with which I can try to change my colleagues' view." (At another point in the same communication, Mr. Read again emphasized that SGS had "real potential investors in place" and assured Mr. Linsley that, to the extent Centurion was "waiting for our deal to fall over… it will not.") Mr Linsley offered to send over a proposal subject to another site visit, but Mr. Read rejected the offer. Finally, on April 24, 2014, Mr. Read wrote to Mr. Linsley indicating that SGS was no longer interested in pursuing a deal with Centurion, stating that "we want to concentrate efforts on parties that we believe will invest alongside us."

The foregoing evidence is not sufficient to demonstrate a triable issue of fact as to whether Mr. Linsley's communications with SGS operated to prevent SGS from finding other financing. From the outset, the SGS LOI expressly represented that SGS's willingness to buy Hudbay was not dependent upon SGS obtaining financing. (Instead, it contemplated that SGS would finance the initial $3 million payment through an initial public offering.) Even during SGS's negotiations with Centurion, Mr. Read made clear to Mr. Linsley that SGS was also courting other interested investors who were themselves capable of reaching a deal. Whether Mr. Read's representations were true – that other investors did indeed exist – or simply stalking horses intending to induce Centurion into agreeing to a deal is irrelevant: Mr. Linsley can hardly be said to have intentionally interfered with SGS's deal with Hudbay by purposefully delaying a deal with the Korean client in the hopes that the deal would fall through for lack of financing if Mr. Linsley was repeatedly told that SGS had other investors standing by to complete the deal if Centurion refused.

For these reasons, the Court finds that SGS has not made a *prima facie* showing that Mr. Linsley acted with an intent to interfere with SGS's performance of the SGS LOI with Hudbay. Mr. Linsley is entitled to entry of summary judgment on SGS's claim for Intentional Interference with Contract.

**B.      Intentional Interference With Prospective Advantage (Count I)**

Mr. Linsley and Mr. Guarnera next move for summary judgment on SGS's claim against them for Intentional Interference with Prospective Business Advantage.  In many respects, this claim is functionally identical to the claim for Intentional Interference With Contract, discussed above, and is insufficient for the same reasons.  Arguably, however, the prospective advantage claim encompasses the period of time after the SGS LOI expired (May 2, 2014), and before the offer by Northern Zinc Corporation was made to Hudbay (July 7, 2014). The Court understands SGS to contend that, during this time period, it continued to have <u>non-exclusive</u> negotiations to buy Hudbay, and that such ongoing negotiations themselves constitute a business advantage to SGS with which Mr. Linsley and Mr. Guarnera interfered.  Put more simply, SGS contends that Mr. Linsley and Mr. Guarnera, via Northern Zinc, swooped in and bought Hudbay for themselves, depriving SGS of the opportunity to do so.

The parties agree[6] that, under Colorado law, a plaintiff asserting a claim for Intentional Interference with Prospective Advantage must prove four elements: that Mr. Linsley and Mr. Guarnera each (1) intentionally (2) interfered with SGS's ability to complete the purchase of Hudbay, using (3) improper means that (4) caused the transaction to fail.  Mr. Linsley and Mr. Guarnera argue that SGS cannot make a *prima facie* showing as to the second, third and fourth elements of the claim.

It is important at this stage to recognize the relative status of the SGS and Northern Zinc/Mr. Linsley and Mr. Guarnera during the relevant time period.   Upon the expiration of the

---

[6]  The Court might define the elements, which appear not to be formally enumerated by any Colorado authorities, slightly differently, but the essence is the same.

SGS LOI, SGS lost its exclusivity as a suitor for Hudbay; instead, it became one of many potential competitors for the right to make that purchase. Thus, at this point in this time period, both SGS and Northern Zinc were ordinary competitors for purchase of shares in the Hudbay entities.

Under Colorado law, where a claim of intentional interference with prospective advantage is brought against a *bona fide* competitor for that advantage, a more exacting inquiry results. *Campfield v. State Farm Mut. Auto Ins. Co.*, 532 F.3d 1111, 1123 (10th Cir. 2008). Ordinarily, the "improper means" element is a fact-intensive inquiry into the defendant's motives, the relative interests of the two parties, and various other factors. *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995). However, when competitors are involved, the plaintiff must show that the alleged "improper means" took the form of particularly severe conduct such as "physical violence, fraud, civil suits, and criminal prosecutions." *R-G- Denver, Ltd. v. First City Holdings of Colo., Inc.*, 789 F.2d 1469, 1476 (10th Cir. 1986).

Here, SGS argues that Mr. Linsley and Mr. Guarnera engaged in fraud, in the sense that they "wore one hat to convince SGS to share valuable and confidential information . . . and then usurped that prospective business advantage themselves." In other words, SGS asserts that the "improper means" Mr. Linsley and Mr. Guarnera used were employed during the SGS-Centurion negotiations. However, SGS has not come forward with any evidence to establish that Mr. Linsley or Mr. Guarnera engaged in actual "fraud" – that is, in making material misrepresentations or omissions to SGS in order to induce their reliance upon false or misleading information. More precisely, SGS has not pointed to any statements made by Mr. Linsley or Mr. Guarnera during the negotiations between SGS and Centurion that were provably false – *e.g.* that, notwithstanding Mr. Linsley's representations, the Korean client was <u>not</u> initially interested in reaching a deal with SGS. Nor has SGS pointed to any material facts that Mr. Linsley or Mr. Guarnera omitted in the

SGS-Centurion negotiations.  SGS seems to <u>assume</u> that Mr. Linsley quickly decided to usurp the Hudbay deal for himself at some point during the SGS-Centurion negotiations and proceeded to sabotage those negotiations as a result, but it points to no actual evidence that would support that assumption.  It is just as plausible to assume that Mr. Linsley negotiated in good faith with SGS to no avail, and that it was only <u>after</u> the SGS LOI expired that it occurred to Mr. Linsley that acquiring Hudbay via Northern Zinc might be desirable.[7]  Thus, the Court finds that SGS has failed to come forward with facts sufficient to demonstrate that, during a time when SGS and Nothern Zinc were competing for Hudbay, Mr. Linsley or Mr. Guarnera used any improper means to prevent SGS from reaching a deal.  Accordingly, both Defendants are entitled to summary judgment on the prospective advantage claim.

### C.  Breach of Fiduciary Duty (Count III)

Mr. Linsley and Mr. Guarnera next challenge SGS's claim for breach of fiduciary duty. SGS's theory for this claim is that by agreeing to assist SGS in finding an investor, Mr. Linsley and Mr. Guernara assumed a fiduciary duty to SGS, and that they thereafter breached that duty by using information they gained from SGS for their own benefit.

Under Colorado law, a claim for a breach of fiduciary duty has the following four elements: 1) that the defendant was acting as a fiduciary of the plaintiff; 2) that the defendant breached a fiduciary duty to the plaintiff; 3) that the plaintiff incurred damages; and 4) that the defendant's breach of fiduciary duty was a cause of the plaintiff's damages.  *Sewell v. Great N. Ins. Co.*, 535 F.3d 1166, 1172 (10th Cir. 2008) (citing *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1022

---

[7]  SGS has not argued, and thus the Court does not consider, whether Mr. Linsley's use of information he gleaned during the SGS-Centurion negotiations would itself constitute "improper means."  In any event, the claims that proceed to trial would significantly overlap with a prospective advantage claim premised upon such an argument.

(Colo. App. 1993)).  Mr. Linsley and Mr. Guarnera move for summary judgment on SGS's breach of a fiduciary duty claim on the grounds that it has failed to meet the first element – *i.e.*, that SGS has failed to come forward with evidence that a fiduciary relationship existed between it and Mr. Linsley and Mr. Guarnera.

Under Colorado law, a fiduciary relationship exists between two persons "when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Accident & Injury Medical Specialists, P.C. v. Mintz,* 279 P.3d 658, 663 (Colo. 2012).  Beyond fiduciary relationships that are established by law (*e.g.* attorney-client, doctor-patient), fiduciary duties may arise based on the particular circumstances of the relationship between the parties, such as where one party occupied a superior position relative to another and assumed a duty to act in the dependent party's best interest.  *Brodeur v. Amer. Home Assurance Co.*, 169 P.3d 139, 151 (Colo. 2007); *Paine, Webber, Jackson & Curtis*, 718 P.2d at 517-18 (where one party had extensive influence and control over the other's interests); *see also* 9 Stuart M. Speiser *et al.*, The American Law of Torts § 32:81 (1992) (fiduciary relation may arise where "one of the parties reposes special trust and confidence in the other who is in a position to have and exercise influence over" the dependent party).  The hallmark of these relationships is that one party has "extensive influence and control over the other's interests," or has received "special trust and confidence" from and occupies a position to exercise influence over the other.  *Rocky Mountain Exploration, Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 235 (Colo. 2018).

SGS contends that Mr. Linsley and Mr. Guarnera assumed such a fiduciary duty by offering to help SGS find a purchaser and by receiving various types of confidential business information belonging to SGS in the process.  While the evidence produced by SGS certainly establishes a *prima facie* case that there was a "loose agreement" between Mr. Linsley and SGS that Centurion

would help it find an investor to fund its purchase of the shares of Hudbay in exchange for a ten percent commission, nothing about that arrangement suggests that Mr. Linsley or Mr. Guarnera were in a position of power relative to SGS, nor that the parties were involved in anything other than an arms-length transaction.  Indeed, when it came time for SGS to disclose information to Centurion, SGS was able to insist that Centurion agree to a non-disclosure agreement, suggesting that SGS had the power to walk away from the relationship if Centurion refused.  The record also reflects that although Mr. Linsley asked SGS to produce a copy of the SGS LOI for Centurion to review, SGS apparently refused to do so – another action that belies the existence of an unbalanced relationship.  SGS also made it clear that it was seeking other investors independently of Centurion, further demonstrating that SGS retained a great deal of bargaining power in the parties' relationship.  Taken as a whole, the record reflects that SGS and Centurion (and by extension, Mr. Linsley and Mr. Guarnera) were simply engaged in an arm's length business transaction, not a fiduciary relationship.  Accordingly, both are entitled to summary judgment on the breach of fiduciary duty claim asserted against them.

### D. Misappropriation of Trade Secrets (Count IV)

The next claim challenged by Mr. Linsley and Mr. Guarnera is SGS's claim for misappropriation of trade secrets.

To prove a claim of misappropriation of trade secrets under the Colorado Uniform Trade Secrets Act (C.R.S. § 7-74-101 *et seq.*), a plaintiff must establish the following elements: 1) that it possessed a valid trade secret, 2) that the trade secret was disclosed or used by the defendant without consent, and 3) that the defendant knew, or should have known, that the trade secret was acquired by improper means.  *See Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 847 (10th Cir. 1993).  Colorado law defines a trade secret to be "the whole or any portion or phase of

any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value." C.R.S. § 7-74-102(4). Moreover, the holder of an alleged trade secret must have acted reasonably to prevent its disclosure. *See Saturn Sys. Inc. v. Militare*, 252 P.3d 516, 522 (Colo. App. 2011).

SGS identifies three purported trade secrets that it claims that Mr. Linsley and Mr. Guarnera misappropriated: 1) knowledge that Hudbay was willing to sell the Balmat mine; 2) SGS's concept for reopening the Balmat Mine and operating it in a new and more profitable manner; and 3) SGS's strategy of acquiring Hudbay and reopening and operating the mine. Mr. Linsley and Mr. Guarnera contend that SGS cannot produce evidence to show that any of the described the information is a trade secret. The Court addresses each purported trade secret in turn.

### 1. Knowledge that the Balmat mine was for sale

Mr. Linsley and Mr. Guarnera contend that SGS cannot establish that Hudbay's willingness to sell the Balmat mine was secret and thus it cannot be a trade secret. They offer evidence that Hudbay's willingness to sell was common knowledge in the mining industry. Mr. Guarnera's declaration states that detailed information about the zinc reserves at the Balmat mine had been publicly available and easily accessible since 1963. In addition, he testified that the fact "that the Balmat mine could potentially be purchased was also public knowledge." He states that Hudbay attempted to sell in the mine in 2013, which transaction was the subject of a public press release which is attached to the movant's brief. Mark Osterberg's declaration further corroborates this.

In response, SGS argues that such evidence does not show public knowledge in December 2013 that the Balmat mine could be purchased. For that fact, SGS points to deposition testimony of Mr. Smith, SGS's designated corporate representative indicating that the Balmat mine was not

on the open market.[8] SGS also refers to the deposition testimony of Chris Wyatt, an industry consultant for Centurion, that <u>he</u> did not know that Hudbay was planning to sell the Balmat mine in December 2013. SGS also refers to a December 28 and 29, 2013 email string among Mr. Guarnera, Mr. Linsley, and Mr. Smith in which reference is made to the potential sale in early 2013 and the fact that did not close.

The burden of proof is on SGS to show that the availability of the Balmat mine was secret in December 2013. The cited evidence, even construed most favorably to SGS, is not sufficient to establish that. At most, it shows that the Balmat mine was not formally on the open market, and Mr. Wyatt and Mr. Guernara did not know about the availability of the mine for sale in December, 2013. There appears to be no dispute that the prior potential 2013 sale was publicly announced less than a year prior. It is less clear whether the fact that it fell through was well-known. But the formal "for sale" status of the mine, and the lack of knowledge by Mr. Wyatt and/or Mr. Guernara do not translate into lack of knowledge by the industry or the public. Put another way, just because something is not officially announced as being for sale does not make the owner's willingness to sell for the right price a secret, nor does the fact that two or three individuals are not aware of something does not make it secret.

Because SGS has failed to come forward with sufficient evidence to make a *prima facie* showing that knowledge of the availability to purchase the Balmat mine in December 2013 was secret, its claim for misappropriation of this information as a trade secret cannot proceed.

### 2. SGS's Plan for Operation of the Balmat Mine

---

[8] The Court notes that the exhibit consisting of Mr. Smith deposition testimony cited by SGS (**#86-**6) actually does not contain any testimony concerning the availability of the Balmat mine. However, an exhibit produced by Mr. Linsley and Mr. Guarnera (**#84-2**) does appear to contain the referenced testimony, so the Court will consider it.

The second grouping of information that SGS contends is a trade secret was Mr. Smith's concept to operate the Balmat mine in a manner that would extract zinc reserves close to the processing buildings in order to operate in a more profitable manner than was previously done. SGS characterizes this idea as confidential and proprietary technical information.

Again, Mr. Linsley and Mr. Guarnera argue that SGS cannot establish that this idea was secret. Instead, they contend concept was a generic industry approach to mining operations that would be devised by any competent mining engineer. They argue that, to the extent that the concept was based on information in Hudbay's data room, it and any derivation of it belongs to Hudbay, not SGS.

The essence of this information is found in Mr. Smith's deposition. (**#84-2**, at pp. 10-11).

> Mr. Smith: During that period of time Chris and I, John Ryan and Jim Baughman, who are also engineers and geologists, walked the mine, spent time at the mine. And effectively I still had all of the information back from the OntZinc days when I worked for OntZinc when I was financing the mine for OntZinc. So I knew how to restart the mine effectively and profitably, stuff that HudBay – or they failed – HudBay failed to run the mine properly. And so Chris Wyatt and myself agreed to a plan to come up with – in a new company agreed to a new plan to put the mine back into production.
>
> Q: What were the details of the plan that constituted trade secrets?
>
> A: More than anything else it's where the reserves were based.
>
> Q: Could you explain, please.
>
> A: The reserves that they had mined for a long time at the Balmat on three different start-ups were a long way away from the mill. The mine that we envisioned came from other reserves that were much closer to the mill that could be run profitably.

SGS also points to deposition testimony from Mr. Wyatt stating that copies of a mine plan are "[t]ypically not" in the public domain.

The question before the Court is whether that evidence is sufficient to establish that Mr. Mr. Smith's concept that the Balmat mine could be operated a particular way that would be more

profitable was secret. This is a close call. Viewing the evidence in the light most favorable light to SGS, it appears that Mr. Smith took Hudbay's information about its reserves, and using his own knowledge and experience, developed a plan or concept for operation of the Balmat mine in a more profitable way that no one had previously used. There is no dispute that this idea was formulate by Mr. Smith and not widely disseminated. Indeed, Mr. Linsley and Mr. Guarnera acknowledge that Mr. Smith's idea is "not embodied in any spreadsheet or set of projections, but rather apparently consists solely of some thought process on the part of Mr. Smith." Nor is there any argument that the idea to operate the Balmat mine more profitably would be of value. Because there has been a *prima facie* showing that this information might constitute a trade secret under Colorado law, there is a factual issue to be tried. Accordingly, the trade secret misappropriation claim premised on Mr. Linsley and Mr. Guarnera's use of the mine plan will proceed to trial.[9]

### 3. SGS's Plan to Purchase the Balmat Mine

The third purported trade secret is described as the "the formulation of the plan to purchase the [Balmat] mine." Because the nature of the protected information and the contours of this purported trade secret are not clear from this label, the Court turns to explanation found elsewhere in the record.

---

[9] Mr. Linsley and Mr. Guarnera also raise three legal arguments, none of which are compelling based on the record. First, they argue that because Mr. Smith's idea to mine in a more profitable manner was not formally reduced to writing, it cannot be a trade secret. However, there is no requirement that a trade secret be in written form. Second, they argue that information on which Mr. Smith's idea was based – the location of certain reserves – was contained in Hudbay's data room, it was Hudbay's trade secret, and not SGS's. This is not persuasive because Mr. Smith's idea is more than just the reserve information stored in Hudbay's data room, and there is no argument that Hudbay had any proprietary interest in Mr. Smith's idea. Finally, they argue that Mr. Smith's description of his idea to operate the mine in a new manner is impermissibly vague. The Court disagrees. The deposition testimony produced by SGS – that Mr. Smith had the idea to mine reserves closer to the Balmat mill, presumably reducing transportation costs – is sufficiently specific and concrete.

SGS states that there is some "overlap" between this information and the first two, and SGS incorporates the arguments – and presumably evidence – that it offered with respect to the first two identified secrets. SGS states that the information in this trade secret consists of "technical information, process, procedure, improvement, confidential business or financial information, and other information relating to SGS's business that is secret and of value." At another point, SGS says that it "knew that establishing itself as a valid purchaser under parameters important to Hudbay was key."

Unfortunately, none of these statements are particularly clarifying. None describe the information with such specificity that the Court or a jury could determine whether the information was secret or had value. Because SGS has not adequately identified the information that it believes was protected and presented evidence showing that such information was secret and of value, there is no triable factual issue. Mr. Linsely and Mr. Guarnera are entitled to summary judgment on the trade secret claim premised upon this "secret."

### E.    Misappropriation of Business Value

As the Court observed in its order denying a prior motion to dismiss on this claim (**#97**), the parameters of a claim for Misappropriation of Business Value under Colorado law are relatively undeveloped. Like the claim for intentional interference with a prospective business advantage, there does not appear to be any clear articulation of elements for this claim. However, the Colorado Court of Appeals has explained that "[a] claim for misappropriation of business value may be established if a person appropriates a product of another's expenditure of labor, skill, and money." *Smith v. TCI Commc'ns*, 981 P.2d 690, 694 (Colo. App. 1999). Based on this law, the parties agree that, at a minimum, a claimant must establish: 1) that a product of its labor, skill, and

money 2) was appropriated by the defendants.[10]

SGS's theory is that Mr. Linsley and Mr. Guarnera used information that SGS provided – particularly information in Hudbay's data --- to cut its own deal with Hudbay through Northern Zinc. Mr. Linsley and Mr. Guarnera argue that SGS 1) has not adequately defined the information that they purportedly took; 2) that SGS cannot show that information that Mr. Linsley and Mr. Guenara purported took was the product of SGS's labor, skill and money; and 3) that because use of the information was governed by the NDA, no tort claim can be asserted under Colorado's economic loss rule.

Before addressing the second and third arguments it is necessary to define what information is the subject of this claim. SGS characterizes it as "every piece of information" that Mr. Linsley and Mr. Guarnera had about the Balmat mine. Such description necessarily includes the information identified in the claim for Misappropriation of Trade Secrets discussed earlier. Borrowing on descriptions used in that context, the Court concludes that the information issue was 1) knowledge that the Balmat mine was for sale; 2) SGS's plan for operation of the mine (which

---

[10]    There is passing reference in the briefing to an additional form of this claim described as "capitalizing wrongfully on commercial values earned over a period of time.'" *Heller v. Lexton-Ancira Real Estate Fund, Ltd.*, 809 P.2d 1016, 1021 (Colo. App. 1990); *see also Klesch & Co. Ltd. v. Liberty Media Corp.*, 234 Fed. App'x 829, 836 (10th Cir. 2007). The meaning of such language has not been clarified further by any Colorado authorities, but the fact pattern from *Heller* is instructive. In the case, a trade show sued an exhibition facility after the facility refused to renew its lease after decades of the trade show using the space. The exhibition facility then started hosting its own trade shows using the same floor plan, personnel, *etc.* In other words, the *Heller* court was addressing a years-long "repeat player" relationship, in which one of the parties ceased doing business with the other and effectively coopted is business model that had been developed over many years of working together. By oblique reference, SGS suggests that these facts are analogous in the present case, which involves a single failed relationship that transpired over the course of a few months, but SGS neither explains the application of that sort of theory nor submits evidence that would establish facts supporting it.

included technical data obtained from Hudbay; and 3) SGS's plan for acquisition of the mine.[11]

### 1. SGS's Plan to Purchase the Mine

Starting with SGS's broad and vague plan for acquisition of the mine, the Court has found that description of the information is too vague and amorphous to determine whether it was secret and of value. Without better description of what this information is, it is also impossible to determine whether it was the product of SGS's labor, skill and money. Thus, there can be no claim for misappropriation of business value based on this.

### 2. Knowledge that the Balmat mine was for sale

Assuming for purposes of analysis that SGS had exclusive knowledge that the Balmat mine was for sale in December 2013, SGS fails to come forward with evidence as to how it gained such knowledge, much less that obtaining that knowledge was the result of its labor, skill and money expended by SGS. The Court notes that some evidence in the record reflects only that Mr. Smith told Mr. Linsley and Mr. Guarnera that SGS learned the information through "a contact." This knowledge may simply have been acquired as the result of happenstance, or the result of following the failed 2013 purchase of Hudbay that was published in industry circles. Or it could have been the result of private communications that occurred because of SGS business connections. However, in the absence of evidence as to the source of this information, characterization of it as a product of SGS's labor, skill or money is purely speculative. Thus, SGS has not come forward with a *prima facie* showing sufficient for the claim for misappropriation of business value based on this.

### 3. SGS's Plan for Operation of the Balmat Mine

---

[11] The Court notes that there could be information that falls outside of that characterized as trade secrets, but SGS has not identified such information nor produced evidence showing that such information was the product of its labor skill or money.

This leaves SGS's plan for Operation of the Balmat mine. Information pertinent to this came from two sources – Hudbay's technical information (often referred to as information in the "data room") and Mr. Smith, who used such information to formulate a plan for operation of the mine. As found earlier, there is a triable issue of fact as to whether this plan constitutes a trade secret under Colorado law. Regardless of whether it is ultimately determined to be a trade secret, however, any claim of misappropriation of business value based upon it is preempted.

To the extent that information is a trade secret, the statutory provisions of the Uniform Trade Secrets Act preempt this claim. C.R.S. § 7-74-108(1). Subsection (1) reads:

> (1) Except as provided in subsection (2) of this section, this article displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.
>
> (2) This article does not affect:
>
> (a) Contractual remedies, whether or not based upon misappropriation of a trade secret;
>
> (b) Other civil remedies that are not based upon misappropriation of a trade secret; or
>
> (c) Criminal remedies, whether or not based upon misappropriation of a trade secret.

A number of decisions have applied this to find that a common law claim for misappropriation will be precluded when it is predicated on the same core nucleus of facts as a statutory trade secret misappropriation claim. *See e.g. L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1087, 1090-91 (D. Colo. 2012); *Powell Prods. Inc. v. Marks*, 948 F. Supp. 1469, 1474 (D. Colo. 1996); *Abbott Labs. v. Finkel*, No. 17-cv-00894-CMA, 2017 WL 5517399, at *3 (D. Colo. Nov. 17, 2017). The Court finds their reasoning persuasive.

To the extent that a jury were to determine that this information is <u>not</u> a trade secret, a claim for misappropriation of business value based on it is also preempted. It is preempted by claims for breach of the Non-Compete and Non-Disclosure Agreement between SGS and Centurion executed

on March 1, 2014. Such agreement was executed in conjunction with SGS's intended acquisition of the mine and governed all of Centurion's directors, officers and employees. It restricted their use of "all confidential, scientific, technical, geological and commercial information materials and data relating to the Balmat Assets" and precluded use of the information except for SGS's acquisition and discussion with Centurion's Korean client. It also expressly prohibited Centurion (and ostensibly by extension Mr. Linsley and Mr. Guarnera) from entering into any direct negotiations or transactions with contacts supplied by SGS except with SGS's consent.

Mr. Linsley and Mr. Guarnera argue that under the "economic loss rule" applicable under Colorado law, the terms of the Non-Compete and Non-Disclosure Agreement preempt any tort claim arising from the same or similar facts. *Town of Alma v. AXCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000); *Casey v. Colo. Higher Educ. Ins. Benefits Alliance Trust*, 310 P.3d 196, 203-04 (Colo. App. 2012). SGS has not meaningfully responded to this argument. The Court agrees with Mr. Linsley's and Mr. Guernara's analysis. Under Colorado law, a party suffering a loss from breach of an express or implied contractual duty may not assert a tort claim for such loss, unless there is an independent duty of care under tort law. Here, the claim for misappropriation of business value is based upon misappropriation of information. Mr. Linsley's and Mr. Guarnera's duties with regard to the information that would be the subject of this claim are addressed in the Non-Compete and Non-Disclosure Agreement. Thus, as a matter of law, SGS can pursue no tort claim based on the same or similar duties.

For the foregoing reasons, Mr. Linsley and Mr. Guanera are entitled to summary judgment on the claim of Misappropriation of Business Value.

### CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (**#82**) is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is **DENIED** with respect to SGS's claim for

misappropriation of its plan for operation of the Balmat mine as a trade secret (Count IV) and the vicarious liability claim against Broadlands arising therefrom. On all other claims, summary judgment is **ENTERED** against SGS and in favor of Mr. Linsley, Mr. Guarnera and Broadlands.

Consistent with the disposition of the claims involving Star Mountain, Northern Zinc's Motion for Summary Judgment is **DENIED** with leave to renew. The parties shall begin preparation of a Proposed Pretrial Order as directed in the Trial Preparation Order previously entered in this case, and shall jointly contact chambers within 14 days of this Order to set this matter for a pretrial conference.

Dated this 30th day of September, 2018.

BY THE COURT:

Marcia S. Krieger
Chief United States District Judge