IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02486-CMA-KLM

SGS ACQUISITION COMPANY LIMITED,

     Plaintiff

v.

DAVID LINSLEY,
BERNARD GUARNERA, and
BROADLANDS MINERAL ADVISORY, LTD.
     Defendants.

---

## Defendants' Motion for Attorney's Fees

Defendants David Linsley, Broadlands Mineral Advisory LTD and Bernard Guarnera ("<u>Defendants</u>"), through their counsel Onsager | Fletcher | Johnson, LLC, file their Motion for Attorneys' Fees as follows:

## <u>INTRODUCTION</u>

An adverse summary judgment ruling eliminated all of SGS's claims, except for the misappropriation of a "concept to operate the Balmat Mine in a manner that would extract zinc reserves closer to the processing buildings in order to operate in a more profitable manner than was previously done" (the "<u>Mining Concept</u>") The summary judgment ruling also eliminated any basis that the misappropriation claim could be by "improper means" under Colo. Rev. Stat. § 7-74-102(a). SGS nevertheless continued to trial, not on the Mining Concept, but instead with previously undisclosed alleged trade secrets.

In SGS's own words in response to Defendants' motion for summary judgment, "[t]he thrust of this case is that Defendants stole the deal for themselves."[1] Despite the adverse summary judgment ruling and the trial being solely on the Mining Concept, SGS stuck with its perception of the case. As the Court will recall from SGS's opening, there was no mention of the Mining Concept. Instead, SGS told the jury that "Guarnera and Linsley" led them on… it was their intent the whole time to take this confidential information and use it for their own benefit."

Defendants seek an award of $368,094.50 in attorneys' fees and $13,973.43 in expenses (other than costs awardable under Rule 54(d)) against Plaintiff SGS Acquisition Company Limited ("SGS"), pursuant to Colo. Rev. Stat. § 7-74-105 for a claim of misappropriation of trade secret made in bad faith, for September 30, 2018 (the date of the summary judgment order), through the date of any order granting this motion.[2]

## CASE HISTORY

1.     This case was filed in 2016. Plaintiff's Second Amended Complaint (the "Complaint") pleaded six counts: Intentional Interference Prospective Business Advantage (Count I), Tortious Interference (Count II), Breach of Fiduciary Duty (Count IIII), Misappropriation of Trade Secrets (Count IV), Misappropriation of Business Value (Count V), and Vicarious Liability (Count VI), relating to Defendant Bernard Guarnera and Broadlands Mineral Advisory Services. [Docket No. 58].

2.     The basic case that Plaintiff portrayed was that Defendants Guarnera and Linsley contracted to locate financing for Plaintiff's purchase of the Balmat mine but never intended to perform. [Docket Nos. 58, 86]. Instead, SGS contended that the alleged

---

[1] Docket No. 86, at page 1
[2] The amount may increase as a result of additional work following the date of this motion.

contract was a pretext that allowed Guarnera and Linsley to prevent SGS from purchasing the mine so Guarnera and Linsley could buy it themselves. As to the trade secret claim, SGS pleaded that Guarnera and Linsley had taken the alleged trade secrets by "improper means," [Docket No. 58, at ¶¶ 60, 61]. In short, SGS claimed that Defendants "stole the deal." [Docket 86, at pages 1, 2].

3.      At the core of its trade secret case was a Non-compete and Non-Disclosure Agreement between Centurion Private Equity Partners and SGS, admitted at trial as Exhibit 1. SGS pointedly did not sue Centurion Private Equity Partners for breach of either the non-disclosure or the non-compete provisions of this Agreement, perhaps because the Agreement placed venue for any such case in London, England and provided that English law would apply. Instead, SGS chose to dress up its breach of contract claims as actions for interference and misappropriation of supposed trade secrets.

4.      Following the close of discovery in the case, Defendants filed a motion for summary judgment motion on all claims in the Complaint. [Docket Nos. 82, 83]. On September 30, 2018, the Court entered summary judgment in Defendants' favor on all claims, except the claim for misappropriation of the Mining Concept. [Docket No. 112].

5.      On January 16, 2019, the parties filed a proposed Final Pretrial Order [Docket No. 123], in which SGS asserted a claim for misappropriation by "improper means." [Docket No. 123, at page 3, ¶ 3]. On January 23, 2019, the Court conducted a final pretrial conference, at which Judge Krieger stated that

> SGS's statement of claims is insufficient. Most significantly, it states conclusions, and it fails to delineate the particular facts that SGS will offer to prove each of the elements of its claims. This is notable insofar as it is impossible to tell which defendants are the subject of the trade secret misappropriation claim, because SGS states only that defendants -- plural -- used the trade secret, without identifying which defendant did what.

3

**Exhibit 1**, at 5:25-6:8 (Transcript of Final Pretrial Conference).

6.      As a result, the parties filed a revised proposed Final Pretrial Order [Docket No. 128], which the Court approved [Docket No. 130]. In the Final Pretrial Order, SGS omitted any claim based on "improper means" misappropriation under Colo. Rev. Stat. 7-74-12(a). Moreover, among the stipulations in the Final Pretrial Order, the parties stipulated that the Mining Concept was not communicated or embodied in any document. [Docket No. 128].

7.      Despite the adverse summary judgment ruling and the narrow Final Pretrial Order, SGS continued to pursue a theory of "improper means" misappropriation and expressly stated its misappropriation claim was not limited to the Mining Concept.

8.      At the close of evidence, the Court granted Defendant's oral motion for a directed verdict pursuant to Fed. R. Civ. P. 50(a).

## Argument

**The Legal Foundation for a Fee Award**

9.      Colorado Revised Statutes § 7-74-105 provides for fee shifting "[i]f a claim of misappropriation is made in bad faith…., the court may award reasonable attorney fees to the prevailing party." Colo. Rev. Stat. § 7-74-105.

10.     A request for fees under Colo. Rev. Stat. § 7-74-105 is properly made by motion. *KAABOOWorks Servs., LLC v. Pilsl*, Civil Action No. 17-cv-02530-CMA-KLM, 2019 U.S. Dist. LEXIS 75101, at *10 (D. Colo. May 3, 2019); *McGriff Ins. Servs. v. Littlestone*, No. 2:21-cv-480-JES-NPM, 2021 U.S. Dist. LEXIS 247925, at *8 (M.D. Fla. Dec. 30, 2021).

11.     Defendants were without question the "prevailing party." Accordingly, the only issue is whether SGS made its claim of misappropriation in "bad faith." Colorado's enactment of the Uniform Trade Secret Act does not define bad faith. However, the majority of courts interpreting the identical provision[3] in other states' enactments of the Uniform Trade Secret Act have articulated a two-factor test for determining whether bad faith exists: "(1) objective speciousness of the plaintiff's claim and (2) plaintiff's subjective misconduct in bringing or maintaining a claim for misappropriation of trade secrets. *Id. Tank Connection, LLC v. Haight*, No. 6:13-cv-01392-JTM, 2016 U.S. Dist. LEXIS 58260, at *2 (D. Kan. May 2, 2016); *Hill v. Best Med. Int'l, Inc.*, Civil Action No. 07-1709, 08-1404, 09-1194, 2011 U.S. Dist. LEXIS 147853, at *10 (W.D. Pa. Dec. 22, 2011) (cataloging authority). In addition, Colorado courts have interpreted identified certain "bad faith" litigation conduct in contexts other than the Uniform Trade Secrets Act. Under either definition, SGS's misappropriation claim for the Mining Concept was in bad faith following the September 30, 2018 order granting summary judgment.

**Bad Faith Defined Under Other States' Enactments of the UTSA**

12.     The task for this Court is to determine how the Colorado Supreme Court would define "bad faith." *Vanguard Envtl., Inc. v. Kerin*, 528 F.3d 756 (10th Cir. 2008)(deciding issue under Oklahoma Uniform Trade Secrets Act). Because Colorado's enactment of the Uniform Trade Secret Act is to be interpreted uniformly, cases from other jurisdictions are persuasive. The majority of courts to interpret other states' enactments of the Uniform Trades Secret Act fee shifting provision apply a two-factor test.

---

[3] Colo. Rev. Stat. 7-74-109 provides that "This article shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this article among states enacting it." Thus, courts interpreting and applying other states' Uniform Trade Secret Acts are persuasive.

*Hill v. Best Med. Int'l, Inc.*, Civil Action No. 07-1709, 08-1404, 09-1194, 2011 U.S. Dist. LEXIS 147853, at *10 (W.D. Pa. Dec. 22, 2011) (cataloging authority).

13.     Under the two-factor test, "objective speciousness exists where there is a complete lack of evidence supporting plaintiff's claims." *Hill v. Best Med. Int'l, Inc.*, Civil Action No. 07-1709, 08-1404, 09-1194, 2011 U.S. Dist. LEXIS 147853, at *11 (W.D. Pa. Dec. 22, 2011) (internal quotations omitted). "Subjective misconduct exists where a plaintiff knows or is reckless in not knowing that its claim for trade secret misappropriation has no merit." *Id.* Failing to provide evidence of the particularity of the trade secret constitutes objective speciousness. *Id.* Knowing that no evidence exists that the defendant has the alleged trade secret constitutes subjective misconduct. *Id.*

14.     In *Hill,* Best Medical sued a number of former employees for misappropriation of alleged trade secrets, asserting the trade secrets were contained on defendants' computers. Best Medical's forensic computer examiner was "ready, willing, and able" to search the hard drives that the defendants turned over, but Best Medical did not have the forensic examiner review the hard drives for two years. The examiner found no evidence of the alleged trade secrets on the hard drives. The *Hill* court concluded that bad faith existed when Best Medical knew it lacked evidence that any defendant had any alleged trade secrets. *Id.*

15.     In the case before this Court, SGS stated in its Supplemental Interrogatory Response No. 2 that while it claimed that the Mining Concept was orally communicated to Guarnera and Linsley, it did not know when; in other words, SGS really had no evidence of any communication. **Exhibit 2**, at p. 4. In the Rule 30(b)(6) deposition of Mr. Greg Smith, Mr. Smith stated that he told the Mining Concept only to Chris Wyatt. **Exhibit 3**, at

pp. 46-47 (relevant pages of Smith deposition). As the Court will recall from the video deposition of Chris Wyatt played at trial, SGS never asked Chris Wyatt a single question in his deposition about the Mining Concept. Chris Wyatt testified, however, that he heard nothing proprietary or confidential from Greg Smith, that he received no real information from anyone at SGS, and that he and Smith talked about college and time in Guatemala.

16.    Having finally settled on Chris Wyatt being the person to whom SGS allegedly communicated the Mining Concept, by the time of Chris Wyatt's deposition, SGS knew or was reckless in its disregard of the truth that it had no evidence that the Mining Concept was ever communicated to Guarnera and Linsley. Once summary judgment entered leaving only the Mining Concept misappropriation claim and eliminating any basis for "improper means" under Colo. Rev. Stat. § 7-74-102(a), SGS knew or was reckless in its disregard for the fact that it could not prove misappropriation. These facts alone demonstrate both the objective speciousness and the subjective misconduct that justify a finding that SGS brought its misappropriation claim in bad faith, warranting an award of attorney's fees to Defendants.

17.    As discussed below, however, SGS's claim was objectively specious for additional other reasons, and additional grounds support a finding of subjective misconduct.

**Bad Faith as Generally Defined by Colorado Courts**

18.    Under Colorado law, a "vexatious" claim is one brought or maintained in bad faith. *City of Holyoke v. Schlachter Farms R.L.L.P.*, 22 P.3d 960 (Colo. App. 2001). "Bad faith may include conduct that is arbitrary, vexatious, abusive, stubbornly litigious, aimed at unwarranted delay, or disrespectful of truth and accuracy." *Hamon Contractors, Inc. v.*

*Carter & Burgess, Inc.*, 229 P.3d 282, 301 (Colo. Ct. App. 2009), citing *Bockar v. Patterson*, 899 P.2d 233, 235 (Colo. App. 1994); see also *Mitchell v. Ryder*, 104 P.3d 316, 320-21 (Colo. Ct. App. 2004); *W. United Realty, Inc. v. Isaacs*, 679 P.2d 1063 (Colo. 1984).

**SGS's Trade Secret Claim Was Vexatious**

19.    SGS had four things to establish at trial to prevail on its one remaining trade secret claim: (1) that it possessed a trade secret; (2) that the trade secret was communicated to Mr. Guarnera or Mr. Linsley; (3) that Mr. Guarnera or Mr. Linsley used the trade secret knowing or having reasonable grounds to know that doing so violated a duty to SGS; and (4) that the use or disclosure was the direct cause of damages to SGS. SGS produced no evidence on (2), (3) or (4), and its case on (1) was frivolous.

**Additional Facts**

20.    SGS waffled and obfuscated its descriptions of the Mining Concept during the course of this case. In the Complaint, SGS described the Mining Concept as follows:

> Star Mountain Resources, Inc., Northern Zinc, LLC, Linsley, and Guarnera previously had no relationship with Hudbay Minerals, nor were they aware that the Balmat mine was available for sale. Furthermore, reserves at the north and south ends of the Balmat mine were not being mined properly, and SGS developed the concept and plan to mine these reserves.

[Docket No. 58, at ¶ 4 (emphasis added)].

21.    During discovery and after a Rule 37 hearing before Magistrate Mix, SGS responded to Defendants' interrogatories about the content of the trade secrets with the following:

> SGS Acquisition Company, Ltd. was the owner of the trade secrets which are the fact that the mine could potentially be purchased, *the plan for reopening the mine*, and the formulation of the plan to purchase the mine. These trade secrets were created by Plaintiff, primarily Greg Smith. The

information was orally communicated to Defendants Linsley and Guarnera in late 2013 and early 2014. Plaintiff does not know when those Defendants communicated the information to Defendants Northern Zinc or Star Mountain Resources

Supplemental Interrogatory Responses (emphasis added), attached as **Exhibit 2**

to this Motion.

22.     The deposition testimony of Mr. Smith, SGS's designated witness under

Rule 30(b)(6) regarding the trade secrets, testified the secret mining concept was limited

to the following:

Q     Another trade secret that's been identified to us, and I quote, is the plan for reopening the mine. What was the plan that constituted the trade secret?

A     Chris Wyatt, who was hired by Barney -- I you guys have --

THE DEPONENT:  Has he been deposed?

MR. DORTCH:  Yes.

A      So Chris was hired by Barney and David to fly up to the mine with, as you mentioned, the private plane earlier.  Chris was on the plane with us.  Chris spent four days with us or three days with us at the mine walking the mine site.  During that period of time Chris and I, John Ryan and Jim Baughman, who are also engineers and geologists, walked the mine, spent time at the mine. And effectively I still had all of the information back from the OntZinc days when I worked for OntZinc when I was financing the mine for OntZinc.  So I knew how to restart the mine effectively and profitably, stuff that HudBay -- or they failed -- HudBay failed to run the mine properly.  And so Chris Wyatt and myself agreed to a plan to come up with -- in a new company agreed to a new plan to put the mine back into production.

(BY MR. ONSAGER)   What were the details of the plan that constituted trade

secrets?

A     More than anything else it's where the reserves were based.

Q     Could you explain, please.

A      The reserves that they had mined for a long time at the Balmat on three different start-ups were a long way away from the mill.   The mine that we

envisioned came from other reserves that were much closer to the mill that could be run profitably.

Q     What else about the plan for reopening the mine constituted a trade secret?

A    The biggest trade secret in all was the confidentiality agreement that we signed with David Linsley and Barney Guarnera before we started.  That was the biggest trade secret, was a confidentiality that your clients broke.  So that was the trade secret for me, sir.

Q     What other elements of the plan for reopening the mine did you consider to be a trade secret?

A    The structure.

Q    The structure of what?

A     The transaction of how to put the structure together that David Linsley and Barney Guarnera had no idea how to do, they stole from us, that -- the mine plan and the mine value.  I believe you have the white paper now that shows what we've been damaged during this period of time.  Do you have that white paper?

Q    Go ahead.  I'm waiting for the rest of the answer.

A    I just was asking a question.

Q    I'm not here to answer questions.

A    Okay.  So obviously you have it and you're not going to recognize it.  But the fact is, is that we've been damaged, according to our white paper, by $28 million for these guys stealing our plan to put-- to buy this mine.  So those are trade secrets to me.

Q     Other than what you have just recited, what -- are there any other elements of the plan for reopening the mine that you consider to be a trade secret?

A    What do you -- I don't understand what you consider to be a trade secret.  You need to define trade secret for me.

Q     You're the person designated.

A    I'm asking you -- there is -- there are all sorts of trade secrets.  Define one for me.  Give me an example for me.

Q     So you're telling me you don't know what a trade secret is?

A     No.  I'm asking for your definition.

Q     No.  I'm asking you to answer the question --

A     I've answered you the question.  They stole all of our underlying value in this deal.  They took a hundred percent of our business plan, which was what I consider a trade secret, and took it and ran with it themselves.

Q     As I said, what other specific elements of plan –

A     I don't need any more.  That's enough.

Q     You're refusing to answer the question?

A      That's enough.  That's all I need, was that they stole -- they stole our deal, and that's all I need.  That's the trade secrets I need.  I'm not refusing -- that's the answer to the question. They stole our deal.

MR. DORTCH:  He's not -- for purposes of the thing he's not asking about the trade secrets. He's asking about the details of one of them, which is the plan.  You're looking at it from the top, but he's asking the details of the plan.

THE DEPONENT:  And I gave him the details of the plan.

MR. DORTCH:  And he's asking if there's else.

THE DEPONENT:  No.  There's nothing else.

## **Exhibit 3.**

23.     In responding to the motions for summary judgment, SGS stated that the Mining Concept was a "mine plan" that was "a unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectible secret" for reopening the mine. [Docket no. 87, at p. 8].

24.     SGS stipulated to the description of the trade secret in Jury Instruction No. 15 as "a concept to operate the Balmat Mine in a manner that would extract zinc reserves closer to the processing buildings in order to operate in a more profitable manner than

was previously done." At no time thereafter did SGS propose to modify this stipulated instruction.

25.     In its opening statement, SGS never once referred to the Mining Concept. Instead, SGS told the jury that the case was about "Guarnera and Linsley led them on… it was their intent the whole time to take this confidential information and use it for their own benefit."

26.     SGS did not question the first four witnesses – Mr. Read, Mr. Linsley, Mr. Guarnera or Mr. Wyatt (SGS's designated non-retained expert on what materials would be considered proprietary in the mining industry) – about the Mining Concept. Instead, SGS elicited hours of testimony about generic "valuable information" and attempted to expand its cause of action to other supposed secrets already addressed and precluded in Judge Krieger's summary judgment order.

27.     Not until the third day of trial and the testimony of Mr. Smith was any testimony elicited about anything related to the alleged trade secret Mining Concept. Mr. Smith testified he supposedly discussed with Mr. Wyatt the following:

     a.  that the mill was run on generators that could be converted to run on natural gas;

     b.  that the hoist at the number 4 shaft needed work;

     c.  that the underground truck fleet was old and should be electrified;

     d.  that he was aware that OntZinc, the predecessor to Hudbay, core drilled four holes near the mill and found zinc; and

     e.  that mining closer to the mill was cheaper and safer.

Further, Mr. Smith admitted on cross examination that the zinc found by drilling these four holes were not "reserves."

28.     As important was to what Mr. Smith did not testify:

    a.  Exactly where the new zinc was found in relation to the mill or the underground tunnels;

    b.  What it would cost and the time it would take to develop the new ore body;

    c.  What the cash flow would look like if one were to embark upon this development as the reopening plan;

    d.  The yield of the ore body or its extent in expected tonnes;

    e.  How the core drilling results were a secret belonging to SGS, given that the engineers at OntZinc, and therefore presumably the engineers at Hudbay, knew these results and were under no obligation to SGS to keep them secret;

    f.  that he told the foregoing "plan" to reopen the mine by developing this new ore body to anyone other than Mr. Wyatt.

29.     At the conclusion of the evidence, this Court granted Defendants' Motion under Rule 50(a) for a directed verdict.

**SGS Had No Colorable Trade Secret**

30.     For purposes of its grant of a directed verdict, this Court assumed without finding that SGS possessed a trade secret. However, a review of the evidence indicates SGS failed to offer anything from which a reasonable jury could conclude that it had anything of the sort. Seen in its best light, SGS's supposed secret was that Mr. Smith knew that OntZinc had drilled four cores that were nearer to the mill than reserves, which by definition are <u>explored and developed</u> ore bodies, that Hudbay had been mining and that it would be more profitable to mine an unexplored and undeveloped ore body where the holes were drilled than to continue to mine reserves.

31.     First, the information about the location and the results of the core drilling were not SGS's secrets: they were OntZinc's and Hudbay's, undoubtedly known to their

engineers and other personnel who drilled the holes and to their management who would have the results. Hudbay was not under any obligation to SGS to keep this information secret. That Defendants and Mr. Wyatt may not have known this information does not establish that it was a secret, much less SGS's secret.

32.     Second, SGS presented nothing that might resemble a plan for reopening the mine, which was the alleged trade secret at issue. Throughout this case, including on summary judgment[4], SGS argued that it possessed a trade secret that was "a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." Mr. Smith's knowledge of the possible ore deposit located by OntZinc's four core drillings is not, of course, a "process, design or operation" and was not by itself a trade secret. The only evidence was that Mr. Smith told Mr. Wyatt that development of these possible ore deposits could proceed by stoping, a technique that the evidence showed was used throughout the mine and was already part of Hudbay's reopening plan for reserves, i.e. the explored and developed ore bodies. Mr. Smith's testimony was devoid of any description of timing before ore would be produced from this unexplored ore body, of the expected yield of the ore body, of the estimated size of the ore body or how much ore production was anticipated, of manpower needs, of specific equipment needs[5], of what reserves would be mined simultaneously with development of this new ore body or of any other detail that a unique plan would entail.

---

[4] See Docket no. 87 at p. 6.
[5] Mr. Smith stated he told Mr., Wyatt that the underground truck fleet could be reduced, but it was not at all clear this was related to developing any particular ore body, and Mr. Smith provided no useful detail.

33.     SGS's idea that mining closer to the mill would save in transportation costs and might be cheaper is neither a plan nor a secret, and no evidence supported the conclusion in any event. SGS did not bother to offer any analysis of the cost of developing the ore body, the feasibility of doing so, or the estimated effect on cash flow. While Mr. Smith was permitted to testify that he told Mr. Wyatt it would save 25% in operating costs, the validity of even that statement was not established because Mr. Smith was not disclosed as a mining expert.

34.     In any event, Mr. Smith's opinion that a mine operator would be well-advised to look at developing a new ore body once the mine was brought back into operation is not "a unified process, design and operation of which, in unique combination, affords a competitive advantage." To call Smith's Mining Concept to explore potential ore resources a process, design and operation stretches the meaning of these words beyond breaking but there is also nothing unique about anything in the Mining Concept to which he testified. SGS cannot state a claim by conflating information that was not widely known with a trade secret.

35.     The other items that Mr. Smith testified he discussed with Mr. Wyatt – hoist repair, replacement or electrification of equipment, and converting generators to run on natural gas – are not elements of a plan that were put together in some unique combination as the statute requires for such information to become a trade secret. In fact, they are unrelated to the supposed Mining Concept of mining reserves closer to the processing buildings but are instead just matters that might be considered by any engineer reopening the mine regardless of where ore was to be mined.

36.     Third, SGS had no evidence that it or Mr. Smith spent any money or time developing this Mining Concept. In stark contrast to Hudbay's reopening plan (admitted Trial Exhibit 27, pp 40-65), SGS's Mining Concept had no backup and no validation. In a very real sense, it was nothing more than idle speculation.

37.     Fourth, Mr. Wyatt testified that he heard nothing confidential or proprietary from Mr. Smith. In other circumstances, this might just be a conflict in the evidence. However, in this case, SGS had endorsed Mr. Wyatt as a non-retained expert on "materials considered to be confidential and/or proprietary," designating Mr. Wyatt's deposition as setting forth his expert opinions. Docket no. 134-1. Thus, its own designated expert contradicted its contention that Mr. Smith's idea was a trade secret. SGS's claim to a trade secret was frivolous.

**No Evidence That Mr. Wyatt Disclosed the Alleged Secret Plan to Mr. Guarnera and Mr. Linsley**

38.     Mr. Smith testified only that he told the "secret" to Mr. Wyatt. Whether or not Mr. Smith's idea was a trade secret, SGS presented no evidence from which a jury might conclude that Mr. Wyatt passed the idea on to Mr. Guarnera and Mr. Linsley. Without this communication, Mr. Guarnera and Mr. Linsley could neither use nor disclose it.

39.     This void in the evidence also forecloses any argument by SGS that it proceeded with this case on the theory that mere acquisition of the alleged secret was enough. That theory required a showing that Mr. Guarnera and Mr. Linsley acquired the Mining Concept from Mr. Wyatt. The lack of any evidence exposes the frivolity of any "mere acquisition" theory.

**No Evidence of Disclosure**

40.     SGS persisted throughout the case, including through the Final Pretrial Order, that Mr. Guarnera and Mr. Linsley had disclosed the alleged Mining Concept to investors and to Star Mountain, yet no investor and no witness from Star Mountain was called to the stand.

41.     SGS presented nothing from which a jury could conclude that Mr. Guarnera or Mr. Linsley disclosed the alleged trade secret to anyone else: no writing, no document, no email and no witness to any conversation. The parties stipulated the Mining Concept was not communicated or embodied in any document. [Docket No. 128].

**No Evidence of Use**

42.     As the Court found, Defendants (and Star Mountain) never reopened the Balmat mine, and thus Mr. Guarnera and Mr. Linsley did not use the Mining Concept to operate the mine.

43.     SGS also had no evidence that the alleged secret Mining Concept ever entered into Mr. Guarnera's or Mr. Linsley's thinking in any manner, which is not surprising given the lack of any evidence that either Defendant ever heard the supposed concept. The lack of any document, such as a cash flow or operating projection, that embodied the Mining Concept and the absence of any evidence that Mr. Guarnera or Mr. Linsley disclosed the alleged secret reinforces the point.

44.     Lest there be any doubt about the void in SGS's case, SGS failed to produce a scintilla even of circumstantial evidence from which a jury might conclude that Mr. Guarnera or Mr. Linsley ever considered Smith's concept to develop an ore body to find

more zinc closer to the mill rather than mining reserves that were already developed and ready to mine.[6]

**No Evidence that Use or Disclosure Caused SGS Its Claimed Damages.**

45.     In this case, SGS was not satisfied with pursuing some measure of the value of the alleged secret, like a royalty, or recovery of alleged costs of development of the trade secret, or even some measure of the value of the Balmat mine with and without Smith's alleged Mining Concept. This reflects the emptiness of Mr. Smith's idea but also SGS's real motive in pursuing this case notwithstanding that SGS knew it could not prove it.

46.     SGS's theory was that when Northern Zinc inked a letter of intent with Hudbay more than 60 days after SGS's exclusive period expired, SGS was prevented from buying the mine. SGS argued that SGS therefore lost the profits it would have made from operating the mine after buying it. Even its unjust enrichment claim, as expressed in the final Pretrial Order, was based on this theory, since SGS asserted that the unjust enrichment was the consideration that Mr. Guarnera and Mr. Linsley supposedly received through Aviano when it "sold" the mine to Star Mountain, i.e. Northern Zinc's return on its investment in the mine. Leaving aside the lack of any evidence that Hudbay would have sold SGS the mine, its theory required proof that "but for" the use or disclosure of the Mining Concept, Mr. Guarnera and Mr. Linsley would not have invested in the Balmat mine. SGS's theory of damages therefore does not work if the alleged Mining Concept was only additive, that is, it presented merely an additional reason that the mine was

---

[6] It is important to not conflate Smith's knowledge that OntZinc had found a possible ore body worth developing, which at most was confidential information, with the plan or concept that SGS claimed was the trade secret.

attractive to Mr. Guarnera and Mr. Linsley. SGS offered nothing at trial to attempt to prove that Mr. Guarnera and Mr. Linsley would not have purchased the mine "but for" the alleged trade secret. SGS did not even attempt to show that a typical investor would only buy the mine if the investor had the alleged trade secret. As a result, even if SGS had evidence sufficient to go to the jury on all the other elements on which it had to prevail, its case would founder because it had no evidence to support its claimed damages theory.

47.     In summary, SGS's inability to offer proof was not limited to just one element of its case. Rather, it had no evidence with which to go to the jury on any element.

**SGS's Prosecution of Its Claim for Trade Secret Misappropriation Was in Bad Faith**

48.     SGS's case was sufficiently devoid of support that this Court directed a verdict in favor of Defendants under Rule 50(a). The Court focused on the use or disclosure requirement. What is striking is that SGS did not offer evidence on any other key element sufficient to require submission of its case to the jury – not on whether it ever possessed a trade secret, whether the supposed secret was communicated to Mr. Guarnera and Mr. Linsley, and whether the alleged use or disclosure of the secret caused the damages SGS claimed.

**SGS Was Disrespectful of the Truth and Its Tactics Were Abusive and Vexatious**

49.     SGS never could decide what its supposed trade secret was. In its Second Amended Complaint, the secret was described as "reserves at the north and south ends of the Balmat mine were not being mined properly, and SGS developed the concept and

plan to mine these reserves." As the undisputed evidence at trial showed, "reserves" is a term of art in the mining industry: it means that the ore body meets ten specific criteria, i.e. that it has been developed and is ready to mine. SGS stipulated that the location of all reserves in the mine was information available in the Hudbay data room. SGS's formulation in the Complaint refers specifically to a plan to mine "these reserves," namely "the reserves at the north and south ends of the Balmat mine." In other words, SGS's claim was a plan that was some novel way to mine ore bodies that Hudbay had already developed.

50.    SGS's responses to interrogatories had substantially less detail than the Complaint, referring to the trade secret simply as "the plan for reopening the mine." See **Exhibit 2**, at p. 4.

51.    Mr. Smith continued the intentional obfuscation in his deposition. He got no more particular than

> The reserves that they had mined for a long time at the Balmat on three different start-ups were a long way away from the mill.  The mine that we envisioned came from other reserves that were much closer to the mill that could be run profitably.

52.    But what SGS presented at trial was neither a plan to mine the reserves at the north and south ends of the mine in some unique way as it had pleaded nor a plan to mine reserves closer to the mill. Mr. Smith admitted on the stand that the potential ore located by OntZinc's core drilling were not reserves at all. The alleged secret "plan" amounted to nothing more than the idea that one should explore where some test bores showed zinc might be. At every turn, SGS avoided using any description, such as "possible or potential reserves" or "ore body" or even the technical term, "resources." Instead, it used the technical term "reserves" knowing that it disrespected the truth in

order to keep its real supposed secret a surprise for trial in hopes that trial by ambush would win the day.

53.     SGS surely was aware of but chose to ignore the well-established requirement that it describe its trade secret with particularity. *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998). Here, its avoidance of detail was not just clever wordsmithing; SGS had to hide the correct details of its supposed secret because those details would reveal how empty the secret actually was. SGS was deliberately seeking to mislead. The fact that it got away with doing so until trial makes it all the more vexatious.

54.     SGS's interrogatory answers proved false in at least one other important respect. In its interrogatory response quoted above, SGS, through Mr. Smith, affirmatively averred the critical fact that the alleged trade secret was orally communicated to Mr. Guarnera and Mr. Linsley. Yet at trial, SGS had no such evidence.

55.     Mr. Smith's deposition testimony made SGS's tactic plain. When pressed for details about what made the alleged mine plan a trade secret, Mr. Smith talked about everything but the mine plan, was combative when pressed, and at the end, said that his cursory description was all there was. That is because SGS did not regard this case as ever being about a trade secret. As Smith himself said:

> The biggest trade secret in all was the confidentiality agreement that we signed with David Linsley and Barney Guarnera before we started. That was the biggest trade secret, was a confidentiality that your clients broke.

**Exhibit 3.**

This case was really about breach of the Non-Compete and Non-disclosure Agreement disguised as a trade secret claim.

56.     The Court may recall that at the final trial preparation conference, Defendants raised their concern that SGS was intent on trying a case under the Non-Compete and Non-Disclosure Agreement, not a case about misappropriation of a trade secret and that SGS would attempt to retry Judge Krieger's summary judgment ruling. Their prediction that SGS would be stubbornly litigious was accurate.

57.     SGS's trial tactics were consistent with the foregoing. At trial, SGS continuously veered toward the provisions of the Non-Compete and Non-Disclosure Agreement. In its opening statement, SGS extolled the jury about the breadth of what might be a trade secret but eschewed any description of the trade secret at issue in this case. It spent the first day and a half of trial testimony eliciting testimony about "information" unrelated to the claimed trade secret. SGS tried to expand its supposed trade secrets beyond the Final Pretrial Order and beyond the ones it argued at summary judgment. Even the ones for which it argued at trial fell far short of anything resembling a trade secret. SGS was desperate to find something in addition to Smith's supposed reopening concept because it knew the alleged reopening plan was not a plan, a concept or even a secret.

58.     SGS's damages theory was not only frivolous, it was consistent only with a cause of action for breach of the Non-Compete and Non-Disclosure Agreement (or the interference with contract and prospective business advantage causes of action that SGS lost on summary judgment). SGS's continued assertion of over $28.0 million in lost profits damages, a figure calculated to have an *in terrorem* effect, was therefore abusive, based on a hope that the jury would decide the case as if it were a breach of the Non-compete and Non-Disclosure Agreement, not a trade secret case.

59.     In summary, SGS conduct of this case was arbitrary, abusive, stubbornly litigious, and disrespectful of truth. As such, it brought its trade secret misappropriation case in bad faith, warranting the award of attorney's fees to Defendants under either the "objective specious/subjective misconduct" standard or the "vexatious litigation" standard. *Hill v. Best Med. Int'l, Inc., supra; City of Holyoke v. Schlachter Farms R.L.L.P.*, *supra.*

**Amount of Fees**

60.     Defendants incurred attorneys' fees from the beginning of the case related to the claim for trade secret misappropriation. However, Defendants have elected not to attempt to apportion the fees among the various claims through the date the Court entered its summary judgment order on October 1, 2018. Instead, they request only the fees incurred after the summary judgment order, since these relate solely to the misappropriation claim.

61.     As recited in the Declaration of Christian C. Onsager under penalty of perjury attached hereto **Exhibit 4**, Defendants incurred  $382,067.93 litigating this case after October 1, 2018. The Declaration sets forth the information required by D.C.COLO.LCivR 54.3.

**Wherefore**, Defendants Mr. Guarnera and Mr. Linsley pray this Court to enter its order granting this Motion awarding these Defendants their attorneys' fees and expenses incurred after the date of the summary judgment order, and for such other relief as the Court deems proper.


//

August 24, 2022.                              ONSAGER | FLETCHER | JOHNSON, LLC

*/s/ Christian C. Onsager*
   Christian C. Onsager, CO # 6889
   Andrew D. Johnson, CO ##36879
600 17th St, Suite 425N
Denver, CO 80202
Ph: (303) 512-1123
Fax: (303) 512-1129
consager@OFJlaw.com
ajohnson@OFJlaw.com